IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CLAUDIA RODRIGUEZ,

        Petitioner,               No. CIV S-05-0260 GEB JFM P

    vs.

GLORIA HENRY, et al.,

        Respondents.        <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

        Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges her 2001 conviction on charges of second degree murder.  Petitioner claims that her constitutional rights were violated by four instances of trial court error:  (1) improper denial of a motion to exclude as involuntary a statement made by petitioner to police; (2) improper refusal to include a jury instruction on the lesser included offense of voluntary manslaughter; (3) improper denial of petitioner's request for substitution of counsel and a continuance of trial; and (4) improper exclusion of evidence that petitioner had passed a polygraph test.

/////

/////

/////

1

1

FACTS[1]

2
3
An information charged [petitioner] with the murder of Biviana Aguirra.  (§ 187, subd. (a).)  [Petitioner] entered a plea of not guilty.

4
5
6
Petitioner sought to substitute counsel and requested a 30-day continuance of the trial date just prior to the start of trial.  The trial court denied the request for a continuance but allowed substitution of counsel prior to trial.  [Petitioner] proceeded to trial with existing counsel.

7
8
A jury trial followed.  Evidence and testimony presented at trial revealed the following sequence of events.

9
[Petitioner] is the former girlfriend of Guillermo Gallegos and the mother of his child.  The victim, Aguirra, dated Gallegos after his involvement with [petitioner].

10
11
12
Late one evening in November 1999, [petitioner] telephoned Aguirra at her home.  Aguirra dressed and left the house, saying she was going out to meet [petitioner] at some nearby apartments.

13
14
During their meeting, [petitioner] gave Aguirra a stuffed rabbit that Aguirra had previously given to Gallegos.  Aguirra returned home with the rabbit.

15
16
Aguirra changed clothes and left again.  She told her mother she was going to give Gallegos "a surprise."  Her family never saw her alive again.

17
18
Around 1:00 a.m. the next day, [petitioner] arrived at Aguirra's home looking for her.  After being told Aguirra was not there, [petitioner] insisted that Aguirra's family check her bedroom.  Gallegos arrived a short time later.

19
20
21
22
Later that morning, a fisherman found the body of a woman along the banks of the Sacramento River and contacted the sheriff's department.  A white plastic grocery bag with a "Dollar Tree" logo covered the head.  A second plastic bag with a "Winco" logo was stuffed in the victim's mouth.  The victim's sweatshirt was pulled up around her shoulders; her pants were pulled below her waist.  A shoe lay near the body.  Tire marks on the nearby road showed a vehicle had turned around.

23
/////

24

25
26
---
[1]  The statement of facts is taken from the opinion of the California Court of Appeal for the Third Appellate District in <u>People v. Rodriguez</u>, No. C041788 (Oct. 1, 2003), a copy of which was lodged by respondents on May 13, 2005 as Lodged Document 5.

1          Fingerprint analysis confirmed the body was that of Aguirra. An autopsy revealed Aguirra died from asphyxiation and
2          uncovered two areas of blunt trauma inflicted shortly before death.

3          Police learned Aguirra was last seen with [petitioner].  A search of [petitioner]'s van unearthed several white plastic bags with
4          Dollar Tree and Winco logos.  A fingerprint matching that of [petitioner]'s thumb was lifted from the bag found over Aguirra's
5          head.

6          Fiber analysis matched fibers found in Aguirra's clothes and hair with the blue carpet inside [petitioner]'s van.  The bottom of
7          the shoe found at the scene had a tire tread impression matching the van's tire.  A jump rope, matching the description of one
8          [petitioner] had in her van, was also found at the scene.

9          Prior to the murder, [petitioner] threatened Aguirra and sought to end Aguirra's relationship with Gallegos.  Once, [petitioner]
10         arrived at Gallegos's residence when Aguirra was present and pounded on the bedroom door, shouting, "'I know you're in there
11         and I'm going to kill you.'"  [Petitioner] called Aguirra a '"bitch" and threatened to kill her.

12

13         [Petitioner] also told a friend she had beaten up Aguirra. [Petitioner] stated she knew someone who would be willing to stab
14         Aguirra, but she did not "'want to take it that far.'"  Several weeks before Aguirra's death, [petitioner] called her home and told
15         Aguirra's relatives she didn't know why Aguirra was dating Gallegos because [petitioner] was the mother of his child and they
16         were still together.  [Petitioner] tried to catch Aguirra cheating on Gallegos.

17         After Aguirra's death, a friend asked why [petitioner] had killed Aguirra.  [Petitioner] told the friend she was sorry and knew it was
18         wrong.

19         Officers interviewed [petitioner] twice; both interviews were entered into evidence at trial.  Two days after the murder,
20         [petitioner] spoke with police.  [Petitioner] told police she saw Aguirra for only 10 minutes the night of the murder.  At that time,
21         [petitioner] returned the stuffed rabbit to Aguirra.

22         During a second interview later that day, [petitioner] told officers she coaxed Aguirra into riding with her to meet Gallegos
23         the night of the murder.  [Petitioner], accompanied by Aguirra, picked up Gallegos.  Gallegos ordered [petitioner] to drive and told
24         her when to stop.  Gallegos went into the back seat with Aguirra. He attempted to have sexual intercourse with Aguirra against her
25         will.

26  /////

1   Gallegos ordered [petitioner] to get him a bag.  [Petitioner]
found a bag in the back of the van and gave it to Gallegos.
2   [Petitioner] heard Aguirra screaming and saw Gallegos pull the bag
over Aguirra's face.  As Aguirra kicked and struggled, one of her
3   shoes flew off.  Gallegos told [petitioner] to hold down Aguirra's
arms.  [Petitioner] complied, holding the victim's arms tightly.
4   [Petitioner] held Aguirra's arms for about 30 seconds until she
stopped struggling.  Aguirra fell to the floor of the van.
5
      [Petitioner] turned the van around and drove to the bank of the
6   Sacramento River.  She opened the van door and helped Gallegos
pull Aguirra's body from the van.  The due threw the body down
7   the bank.
8         Gallegos told [petitioner] to drive back to Aguirra's house.
After [petitioner] dropped Gallegos off down the block, she went
9   to the house pretending to look for Aguirra.  Later, [petitioner]
picked up Gallegos and drove him back to her house.[2]
10
      [Petitioner] offered only one witness.  Her high school principal
11   testified [petitioner] had a reputation in the community for
nonviolence.
12
      During closing argument, the defense reminded the jury that
13   Gallegos attempted to have sexual intercourse with Aguirra while
[petitioner] sat in the van.  Defense counsel argued [petitioner]
14   acted impulsively and irrationally when she aided Gallegos.

15      The jury found [petitioner] not guilty of first degree murder but
guilty of second degree murder.  [Petitioner] filed a motion for a
16   new trial; the court denied the motion.

17   People v. Rodriguez, slip op. at 2-6.

18                          ANALYSIS

19   I.  Standards of Review Applicable to Habeas Corpus Claims

20      Federal habeas corpus relief is not available for any claim decided on the merits in

21   state court proceedings unless the state court's adjudication of the claim:

22      (1) resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established Federal law, as
23      determined by the Supreme Court of the United States; or

24   /////

25   _____

26      [2] Gallegos was charged with murder.  The charges were dismissed.

4

1          (2) resulted in a decision that was based on an unreasonable
           determination of the facts in light of the evidence presented in the
2          State court proceeding.

3    28 U.S.C. § 2254(d).

4          Under section 2254(d)(1), a state court decision is "contrary to" clearly

5    established United States Supreme Court precedents if it applies a rule that contradicts the

6    governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

7    indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different

8    result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406

9    (2000)).

10         Under the  "unreasonable application" clause of section 2254(d)(1), a federal

11   habeas court may grant the writ if the state court identifies the correct governing legal principle

12   from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

13   prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ

14   simply because that court concludes in its independent judgment that the relevant state-court

15   decision applied clearly established federal law erroneously or incorrectly.  Rather, that

16   application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63,

17   123 S.Ct. 1166, 1175 (2003) (it is "not enough that a federal habeas court, in its independent

18   review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

19         The court looks to the last reasoned state court decision as the basis for the state

20   court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court

21   reaches a decision on the merits but provides no reasoning to support its conclusion, a federal

22   habeas court independently reviews the record to determine whether habeas corpus relief is

23   available under section 2254(d).  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

24   /////

25   /////

26   /////

II.  <u>Petitioner's Claims</u>

    A.  <u>Denial of Motion to Exclude Statement to Police</u>

        Petitioner's first claim is that her due process rights were violated by the trial court's improper denial of her motion to suppress her statement to police.  The last reasoned state court rejection of this claim is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal.  <u>See</u> Lodged Document 5.  The state court of appeal set forth the facts relevant to this claim as follows:

        During trial, [petitioner] moved to exclude her tape-recorded statement to police, arguing she made it involuntarily.  The trial court held a hearing on the motion.

        Kory Honea, a sheriff's detective, testified he contacted [petitioner] outside the Jackpot Market after she got off work.  He asked her to accompany him to the sheriff's substation.  Honea told [petitioner] she was not in custody and was free to leave.  [Petitioner] gave an interview at the substation and left.

        After the initial interview, Honea interviewed Gallegos.  Police then contacted [petitioner] and asked her to return to the substation for further questioning.  [Petitioner] complied.

        During the second interview, Honea told [petitioner] he doubted her truthfulness at the initial interview.  [Petitioner] began to admit her involvement in the murder.  Honea advised [petitioner] of her *Miranda* rights and the interview continued.[3]

        During the interview and prior to the *Miranda* warning, [petitioner] began crying and said:  "I don't want to lose my son."  Honea responded.  "OK.  You need to start worrying about yourself right now and the thing about it is every time you tell me a lie, you get closer and you get closer to losing your son and losing a whole bunch of your life."

        [Petitioner] told Honea that Aguirra's former boyfriend, Jose, suffocated Aguirra in [petitioner]'s van.  After Honea expressed disbelief in the story, [petitioner] asked to see her son.  Honea replied:  "Ok.  Who was really with you?"  [Petitioner] expressed fear of retaliation by Gallegos's brother.  She told Honea:  "He said if I say anything to make his brother go to jail he's going to kill my family."  Honea responded:  "[I]f you talk to me honestly and tell

---

[3]  *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*).

me what happened . . . I will make sure that no harm comes to your family."

[Petitioner] asked again to see her son.  Honea responded by urging [petitioner] to "tell me your side of the story. . . .  Tell me what happened, OK?"  [Petitioner] again expressed fear of Gallegos's family.  Honea responded: "[T]here are ways . . . that you can be protected . . . ."

[Petitioner] asked: "If me and [Gallegos] go to jail, who gets my baby?"  Honea responded: "Uh, the baby . . . let me ask you a couple of questions, OK?  Uh, you and [Gallegos] aren't married, right? . . . Is [Gallegos's] name on the baby's birth certificate? . . . Does [Gallegos] pay child support? . . . Does [Gallegos] have any custody paperwork?  No?  OK.  [Y]ou guys have never been to court? . . .  Then . . . your baby stays with your mom and da[d] most of the time . . . or a good portion of the time?  OK.  Then I can say fairly confidently that the baby is gonna stay with your mom and dad, OK.  I say that because in looking at the situation in here, I can't see, as it stands right now, [Gallegos] has any legal . . . papers to . . . and he goes to jail, then he's not have any . . . his family certainly wouldn't have a standing because there's no legal paperwork there.  You guys weren't married or any of that . . . anything of that nature and the baby's been primarily . . . cared for by your mom and dad, right?  So, people making those kind of decisions would look at all those factors.  Does that make sense to you?  OK?  That's why I had to ask those questions, OK?  I assume that's where you want your baby."  [Petitioner] responded in the affirmative, and Honea asked her to tell him what happened.

[Petitioner] acknowledged she drove the van with Aguirra and Gallegos to the river and admitted helping hold Aguirra's arms while Gallegos put the bag over her head.  Honea advised [petitioner] of her *Miranda* rights.

At the hearing on the statements, defense counsel argued [petitioner]'s statements were made in response to Honea's threats and promises concerning her son.  The trial court denied the motion, finding:  "It does not appear to the Court that the conduct of this interview was such that it rendered the product of the interview involuntary, so the Court will find that the statements generated by the interview were voluntary . . . ."

People v. Rodriguez, slip op. at 6-9.  The state court of appeal rejected petitioner's claim that the

statements were involuntary and should not have been admitted.  The state court found that

"[petitioner] herself initiated the discussion about her son" and that the officer "did not expand

upon or exploit her fears" but "[i]nstead, . . . told [petitioner] her failure to tell the truth would

7

1  lead her 'closer and . . . closer to losing your son and losing a whole bunch of your life.'"  Id. at

2  12.  In addition, the state court found that petitioner also initiated the discussion concerning

3  placement of her son in the event she went to prison and that, in response, the officer asked "a

4  series of questions that a court might consider in placing the child.  Honea did not suggest or

5  imply the police had any authority over custody matters, nor did he link custody to [petitioner]'s

6  cooperation.  Honea made no promises about the child's placement."  Id. at 13.

> The Fifth Amendment, made applicable to the states through the
> Fourteenth Amendment, commands that no person "shall be
> compelled in any criminal case to be a witness against himself."
> U.S. Const. amend. V. We have interpreted this proposition to
> mean that an inculpatory statement is voluntary "only when it is the
> product of a rational intellect and a free will." United States v.
> Leon Guerrero, 847 F.2d 1363, 1365 (9th Cir.1988). "The test is
> whether, considering the totality of the circumstances, the
> government obtained the statement by physical or psychological
> coercion or by improper inducement so that the suspect's will was
> overborne." Id. at 1366 (citing Haynes v. Washington, 373 U.S.
> 503, 513-14, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963)).[4]
>
> In other words, a statement may be considered involuntary if it
> is "extracted by any sorts of threats or violence, [or] obtained by
> any direct or implied promises, however slight, [or] by the exertion
> of any improper influence." Hutto, 429 U.S. at 30, 97 S.Ct. 202
> (internal quotation marks omitted). But the breadth of this rule is
> circumscribed by the requirement that "[t]he promise must be
> sufficiently compelling to overbear the suspect's will in light of all
> attendant circumstances." Leon Guerrero, 847 F.2d at 1366 (citing
> Hutto, 429 U.S. at 30, 97 S.Ct. 202).

19  Beaty v. Schriro, 509 F.3d 994, 999 (9th Cir. 2007); see also Juan H. v. Allen, 408 F.3d 1262,

20  1273 (9th Cir. 2005) (quoting Lynumn v. Illinois, 372 U.S. 528, 534, 83 S.Ct. 917, 9 L.Ed.2d 922

21  /////

---

   [4] Importantly, the voluntariness test does not ask whether the suspect would have given the statement "but for" the government conduct. As we noted in Leon Guerrero: Causation, including but-for causation, has never been the test for voluntariness. Hutto v. Ross, 429 U.S.[28,] 30, 97 S.Ct. 202, 50 L.Ed.2d 194 [ (1976) (per curiam) ]. If the test was whether a statement would have been made but for the law enforcement conduct, virtually no statement would be deemed voluntary because few people give incriminating statements in the absence of some kind of official action. See Schneckloth v. Bustamonte, 412 U.S. 218, 224-25, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).847 F.2d at 1366 n. 1.

1  (1963) and Schneckloth v. Bustamonte, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854

2  (1973)).

3          This court has reviewed both of the interviews of petitioner by Sergeant John

4  Kuhn and Detective Kory Honea.  See Lodged Documents 13 and 14.  This court finds no

5  evidence of "physical or psychological coercion" or "improper inducement" in either of the

6  interviews, and no evidence that petitioner's statements were extracted by any threat or improper

7  promise.  The state court of appeals' findings that petitioner initiated the discussions about her

8  son and that the detective neither expanded or exploited her fears about losing her son, nor made

9  any promises concerning her son's placement in the event of her incarceration are fully supported

10 by the record, and the state court's rejection of this claim is in accord with controlling principles

11 of federal law.  Petitioner's first claim for relief should be denied.

12         B.  Refusal to Give Lesser Instruction of Voluntary Manslaughter

13         Petitioner's second claim for relief is that the trial court erred in refusing to

14 instruct the jury on the lesser included offense of voluntary manslaughter.  The last reasoned state

15 court rejection of this claim is the decision of the state court of appeal on petitioner's direct

16 appeal.  The state court of appeal set forth the facts relevant to this claim as follows:

17              [Petitioner] requested the voluntary manslaughter instruction.
           The court denied the request, finding neither the method of the
18         killing nor [petitioner]'s statements to police supported a heat of
           passion claim.  As the court noted:  "In this case the decedent died
19         of asphyxiation with a bag blocking internally or partially blocking
           her airway.  [A b]ag that was found in her mouth and throat area as
20         well as the bag over her head.  [¶]  Based on evidence, we have the
           statement of Ms. Rodriguez this was done by Mr. Gallegos either
21         because Ms. Aguirra refused to have sex with him or from his
           desire to eliminate one of the two women in his life for some
22         reason, it does not appear that either of those amount to a sudden
           quarrel or heat of passion.  [¶]  And even if you look at the
23         circumstances of the death, separate and distinct from Ms.
           Rodriguez's statement, the manner in which the person died does
24         not carry with it any persuasive inference of sudden quarrel or heat
           of passion.  When you add Ms. Rodriguez's narrative to it, clearly
25         the Court does not feel there's any evidence of sudden quarrel, heat
           of passion or any other facts or circumstances that would justify
26         voluntary manslaughter.

9

1         Following the trial, [petitioner] moved for a new trial, arguing
2    the trial court erred in refusing to instruct on voluntary
     manslaughter.  The trial court disagreed, stating:  ". . . I think it's
3    pretty clear that we look to the acts and conduct of the perpetrator
     on the one hand to fix the nature and degree of the crime being
4    committed and then to the knowledge of the aider and abettor on
     the other hand, to see if that person did, with knowledge of what
5    was going on, somehow participate whether it be by assisting or
     otherwise."

6    People v. Rodriguez, slip op. at 13-14.  The state court of appeal rejected petitioner's claim on

7    the ground that there was insufficient evidence to support an instruction on voluntary

8    manslaughter.  Specifically, the state court made the following findings:

9         [Petitioner] argues sufficient evidence supported an instruction
     on voluntary manslaughter based on heat of passion.  [Petitioner]
10   points to evidence that she and Gallegos had a child.  Gallegos left
     her and began seeing Aguirra.  [Petitioner], still in love with
11   Gallegos, tried to disrupt his relationship with Aguirra.
     [Petitioner] fought with an threatened Aguirra.  The night of the
12   murder, Gallegos attempted to have sexual intercourse with
     Aguirra while [petitioner] sat in the van.  [Petitioner] began to cry
13   because she could not believe Gallegos would attempt to have sex
     with Aguirra in front of [petitioner].  [Petitioner] claims her
14   obsession with Gallegos and jealousy of Aguirra support a
     voluntary manslaughter instruction based on heat of passion.
15   [Petitioner]'s "heat of passion was exacerbated by being forced to
     watch while her former lover attempted to have sex with his
16   current lover."

17        While the evidence [petitioner] cites provides her with a motive
     for wanting Aguirra dead, we do not find it sufficient to show
18   [petitioner] acted in the heat of passion when she helped Gallegos
     kill Aguirra.  As the prosecution points out, [petitioner]'s tape-
19   recorded interview with Honea provides the only evidence of
     [petitioner]'s state of mind during Aguirra's murder.

20
          During the interview, [petitioner] described the events
21   immediately preceding the murder:

22        "[[Petitioner]]:  And we stopped and I stayed in the front seat,
     and he went in the back with [Aguirra].  That's when he tried to get
23   her to have sex with [him].  And I started crying because I felt bad
     'cuz I couldn't believe he was doing that in front of me.
24
          "[Honea]:  OK.
25
          "[[Petitioner]]:  He kept telling me to shut up.  He said he
26   wanted to get things out of the way that night.  He wanted to get

over everything because everybody kept telling him that [Aguirra] was cheating on him, and this Jose Cortez guy kept telling me that he was with her and he was going to get married with her or something like that.

"[Honea]:  OK.

"[[Petitioner]]:  So . . . we stopped there, he tried to have sex with her . . . she didn't want to . . . she kept pushing . . . tried to push him out of the way but then she couldn't.

"[Honea]:  OK.

"[[Petitioner]]:  That's when I kept telling him, 'Don't do that . . . .''  And he said, 'You know what . . . what you need to do is get me a bag.'  And I go, 'What for?[']

"[Honea]: . . . Go ahead.

"[[Petitioner]]:  And he just said, 'Just get me the bag.'  So I went to the back because I had lots of bags from the 98¢ Store that me and friend had just gone to buy.  So I just . . . .

"[Honea]:  In Chico?

"[[Petitioner]]:  Yeah, so I just got one of the bags that had stuff in it . . . I put it in another one, and I gave it to him.  [¶] . . . [¶]  So, I gave him the bag.  He told me to sit back where I was at, so I sat back.  [Aguirra] didn't even think nothing.

    Nothing in [petitioner]'s statement supports her assertion that she was forced to watch Gallegos and Aguirra have sex in the van.  Nor does her statement reveal any evidence of passionate or irrational behavior on [petitioner]'s part.  [Petitioner] simply followed Gallegos's instructions, finding a bag and holding Aguirra's arms while Gallegos suffocated her.  [Petitioner]'s controlled actions belie any "heat of passion" on her part during the murder.  We find insufficient evidence to support an instruction on voluntary manslaughter.[5]

See id. at 14-18.

        The United States Court of Appeals for the Ninth Circuit has held that "'the

failure of a state trial court to instruct on lesser included offenses in a non-capital case does not

_____

        [5]  The People concede the trial court erred in concluding that [petitioner]'s liability as an aider and abettor was necessarily the same as that of the perpetrator.  (See People v. McCoy (2001) 25 Cal.4th 111, 1118-1120.)  However, we affirm the trial court's findings if correct under any theory.  (People v. Zapien (1993) 4 Cal.4th 929, 976.)

1    present a federal constitutional question.'" <u>Solis v. Garcia</u>, 219 F.3d 922, 929 n.7 (9th Cir. 2000)

2    (quoting <u>Windham v. Merkle</u>, 163 F.3d 1092, 1106 (9th Cir. 1998)).  However, a "defendant's

3    right to adequate jury instructions on his or her theory of the case might, in some cases, constitute

4    an exception" to this general rule.  <u>Solis</u>, at 929 (citing <u>Bashor v. Risley</u>, 730 F.2d 1228, 1240

5    (9th Cir. 1984)).  In order for the exception to apply, however, there must be evidence to support

6    the requested instruction; due process does not required that an instruction be given unless the

7    evidence supports it.  See <u>Hopper v. Evans</u>, 456 U.S. 605, 611 (1982); <u>see also</u> <u>Miller v. Stagner</u>,

8    757 F.2d 988, 993 (9th Cir. 1985), *amended*, 768 F.2d 1090 (9th Cir. 1985).

9          Under California law

10         "[m]urder is the unlawful killing of a human being with malice
           aforethought. (§ 187, subd. (a).) A defendant who commits an
11         intentional and unlawful killing but who lacks malice is guilty of ...
           voluntary manslaughter. (§ 192.)" (*People v. Barton* (1995) 12
12         Cal.4th 186, 199 [47 Cal.Rptr.2d 569, 906 P.2d 531] (*Barton*).)
           Generally, the intent to unlawfully kill constitutes malice. (§ 188;
13         *People v. Saille* (1991) 54 Cal.3d 1103, 1113 [2 Cal.Rptr.2d 364,
           820 P.2d 588]; see *In re Christian S.* (1994) 7 Cal.4th 768,
14         778-780 [30 Cal.Rptr.2d 33, 872 P.2d 574] (*Christian S.*).) "But a
           defendant who intentionally and unlawfully kills lacks malice ... in
15         limited, explicitly defined circumstances: either when the
           defendant acts in a 'sudden quarrel or heat of passion' (§ 192,
16         subd. (a)), or when the defendant kills in 'unreasonable
           self-defense'-the unreasonable but good faith belief in having to act
17         in self-defense (see [] *Christian S.*[, supra,] 7 Cal.4th 768; []
           *Flannel*, *supra*, 25 Cal.3d 668)." (*Barton*, *supra*, 12 Cal.4th at p.
18         199.) Because heat of passion and unreasonable self-defense
           reduce an intentional, unlawful killing from murder to voluntary
19         manslaughter by negating the element of malice that otherwise
           inheres in such a homicide (*ibid.*), voluntary manslaughter of these
20         two forms is considered a lesser necessarily included offense of
           intentional murder (*id.* at pp. 201-202).

21

22   <u>People v. Breverman</u>, 19 Cal.4th 142, 153 (9th Cir. 1998).

23         The record suggests that petitioner's theory was that Guillermo Gallegos was

24   acting in the heat of passion when he killed the victim, that petitioner aided and abetted that

25   crime, and that she acted "impulsively" and "irrationally" in so doing.  See, <u>e.g.</u>, Court Reporter's

26   Transcript on Appeal, Volume 3, at was an aider and abettor in the crime, at 691-693.  Thus, it is

1   arguable that the instant claim falls within the theory of defense exception to the general rule that

2   failure to instruct the jury on a lesser included offense in a non-capital case does not violate the

3   federal constitution.  Even so, after review of the record, the court finds the state court's

4   determination that there insufficient evidence to support a voluntary manslaughter instruction to

5   be fully supported by the record.  The state court's rejection of this claim was neither contrary to,

6   nor an unreasonable application of, clearly established federal law.  Petitioner's second claim for

7   relief should be denied.

8          C.  Denial of Request to Substitute Retained Counsel

9          Petitioner's third claim for relief is that her Sixth Amendment right to counsel was

10  violated when the trial court denied her request for a thirty-day continuance to allow substitution

11  of retained counsel in place of court-appointed counsel.  The last reasoned rejection of this claim

12  is the decision of the state court of appeal on petitioner's direct appeal.  The state court of appeal

13  set forth the facts relevant to this claim as follows:

14          Less than two days prior to the start of trial, the court held a
        hearing to consider [petitioner]'s request to allow retained counsel
15      to substitute for appointed counsel  Retained counsel Grady Davis
        moved to substitute for appointed counsel Eric Ortner on the
16      condition the trial be continued.  Six weeks earlier, Davis had met
        with [petitioner]'s family.  Davis initially planned to serve as
17      "second chair" during the trial.  However, according to Davis, the
        arrangement was no longer feasible.  Davis stated:  "Even in light
18      of that, I would be willing to substitute in as attorney of record . . .
        ."  He estimated he would need an additional 30 days to prepare for
19      trial.

20          The prosecutor objected, noting trial had previously been twice
        continued for a total of seven months.  The current trial date had
21      been chosen to accommodate the schedules of over 20 witnesses.
        The prosecution stated the prosecution's witnesses had been lined
22      up for trial.

23          Ortner stated he first learned of [petitioner]'s decision to replace
        him two days previously.  A conversation with [petitioner] and her
24      family "caused things to come to a head."  Ortner was prepared to
        try the case as scheduled.

25
            The trial court noted it scheduled the trial date in response to
26      [petitioner]'s motion to allow the defense more time to investigate

13

1   prior to trial.  The court found the latest request for a continuance
2   too close to the current trial date and denied the request and denied
    the motion.  The court explained:  "The primary issue is the
3   closeness to November 13.  Today is the 8th, tomorrow is Friday,
    then there's three non court days so really we're in court days --
4   we're about 48 hours from jury selection plus or minus.  [¶]  The
    cases that I reviewed indicate that . . . Ms. Rodriguez does have a
5   right to counsel of her choice and to substitute counsel so long as it
    does not affect the proceedings of the court or impact them unduly.
6   The Court feels that to start all over again with the trial court
    would have that effect particularly in light of the latitude that the
7   Court has given in setting this date five months ago and over the
    People's objection.  [¶]  So the Court will deny the request for
8   continuance.  That doesn't mean Mr. Davis can't substitute in, I'm
    not denying him from substituting in but I am denying the
9   continuance."

10  People v. Rodriguez, slip op. at 18-20.  The state court of appeal, citing state law, rejected

11  petitioner's claim on the ground that the trial court had not abused its discretion in denying the

12  request for a continuance.  Id. at 20-21.  Specifically, the court made the following findings:

13          Here, the trial court did not, as [petitioner] suggests, deny a
        request for substitution of counsel.  The court denied [petitioner]'s
14      request for a continuance and allowed retained counsel to
        substitute in before trial. In effect, the court allowed the
15      substitution but required retained counsel to adhere to the trial
        schedule.
16
            We find no abuse of discretion on the part of the trial court in
17      denying the request for a continuance.  [Petitioner]'s family
        approached Davis about representing [petitioner] approximately six
18      weeks before trial.  However, neither Davis nor Ortner informed
        the court regarding Davis's substitution as counsel until two days
19      before the start of trial.  In addition, the court had already
        continued the previous trial date by seven months at [petitioner]'s
20      request.  Trial had ultimately been set after over 20 prospective
        witnesses had been polled as to their availability.  The tardy
21      request, in conjunction with the mechanics of setting a trial date to
        accommodate counsel, witnesses, and the court's own calendar,
22      and [petitioner]'s failure to explain why Ortner could not
        adequately represent her support the trial court's denial of
23      [petitioner]'s request for a continuance.

24  Id. at 21.

25          The Sixth Amendment provides that,"[i]n all criminal
        prosecutions, the accused shall enjoy the right ... to have the
26      Assistance of Counsel for his defence."  U.S. CONST. amend. VI.

                                        14

1    This right "guarantees a defendant the right to be represented by an
2    otherwise qualified attorney whom that defendant can afford to
     hire, or who is willing to represent the defendant even though he is
     without funds." Caplin & Drysdale, Chartered v. United States,
3    491 U.S. 617, 624-25 (1989); see also Powell v. Alabama, 287
     U.S. 45, 53, 53 S.Ct. 55, 77 L.Ed. 158 (1932) ("It is hardly
4    necessary to say that the right to counsel being conceded, a
     defendant should be afforded a fair opportunity to secure counsel
5    of his own choice."). In addition, a defendant who establishes that
     his right to counsel of choice was violated need not demonstrate
6    prejudice in order to be entitled to relief, as a defendant claiming
     ineffective assistance of counsel is required to do. United States v.
7    Gonzalez-Lopez, 548 U.S. 140, 126 S.Ct. 2557, 2562, 165 L.Ed.2d
     409 (2006) (explaining that once the right to counsel of choice is
8    violated, "[n]o additional showing of prejudice is required to make
     the violation 'complete.' ").
9
     The Supreme Court has emphasized, however, that the right to
10   counsel of choice is "circumscribed in several important respects."
     Wheat v. United States, 486 U.S. 153, 159, 108 S.Ct. 1692, 100
11   L.Ed.2d 140 (1988). Indeed, there are four specific situations in
     which the Sixth Amendment does not entitle a defendant to
12   preferred counsel: A defendant does not have the right to be
     represented by (1) an attorney he cannot afford; (2) an attorney
13   who is not willing to represent the defendant; (3) an attorney with a
     conflict of interest; or (4) an advocate (other than himself) who is
14   not a member of the bar. Id. In addition, the Court has established
     that a trial court requires "wide latitude in balancing the right to
15   counsel of choice against the needs of fairness, and against the
     demands of its calendar." Gonzalez-Lopez, 126 S.Ct. at 2565-66
16   (citation omitted). As such, trial courts retain the discretion to
     "make scheduling and other decisions that effectively exclude a
17   defendant's first choice of counsel." Id. at 2566.

18   Miller v. Blacketter, __ F.3d __, 2008 WL 2009748, slip op. at 4 (9th Cir. May 12, 2008).

19       This court has reviewed the record of the state court proceedings.  The state court

20   of appeals' findings concerning petitioner's request for a continuance are fully supported by the

21   record.  The trial court's decision to allow petitioner to substitute her retained counsel but to deny

22   the request for a continuance did not, under the circumstances of this case, violate petitioner's

23   Sixth Amendment right to counsel of her choice.  See Miller, slip op. at 4-6 (no violation of

24   Sixth Amendment right to counsel of choice through denial of motion to withdraw and for

25   postponement made on morning of trial where, inter alia, counsel was "sufficiently prepared for

26   trial" and petitioner had full and fair opportunity to seek counsel of his choice); see also Wheat v.

1  U.S., 486 U.S. 153 (1988) (cited in Miller, slip op. at 6) (no abuse of discretion in denying

2  motion to substitute counsel made two court days before start of trial).

3       D.  Exclusion of Evidence that Petitioner Passed a Polygraph Test

4       Petitioner's final claim is that the trial court in denying her motion to introduce

5  evidence that she had passed a polygraph test.  The last reasoned state court rejection of this

6  claim is the decision of the state court of appeal on petitioner's direct appeal.  The state court of

7  appeal set forth the facts relevant to this claims as follows:

8       Prior to trial, defense counsel moved to introduce evidence that
   [petitioner] passed a polygraph test administered by Sam Lister, a
9  retired law enforcement officer.  Defense counsel stated Listed
   could establish his qualifications as an expert in polygraph
10 examinations.  In addition, defense counsel stated his belief that
   polygraph evidence is gaining acceptance within the scientific
11 community.

12      The trial court asked the prosecution if it would be willing to
   stipulate to the admission of polygraph evidence.  The prosecution
13 declined.  The court found the evidence inadmissible under
   Evidence Code section 351.1. . . .

14

15 People v. Rodriguez, slip op. at 22-23.  California Evidence Code section 351.1 precludes

16 admission of polygraph results in any criminal proceeding absent stipulation of all parties.  Cal.

17 Evid. Code § 351.1(a).  The state court of appeal rejected petitioner's claim that exclusion of this

18 evidence violated her constitutional right to present a defense, finding that a criminal defendant's

19 "right to offer evidence material and favorable to her defense -- has never been applied to compel

20 the admission of exculpatory polygraph evidence."  People v. Rodriguez, slip op. at 24.  The state

21 court of appeal relied on United States v. Scheffer, 523 U.S. 303 (1998), where the United States

22 Supreme Court upheld a rule excluding polygraph evidence from military courts martial, finding

23 that in Scheffer:

24      The [United States Supreme] court distinguished *Rock v. Arkansas*
   (1987) 483 U.S. 44 [97 L.Ed.2d 37] and *Chambers v. Mississippi*
25 (1973) 410 U.S. 284 [35 L.Ed.2d 297], cases cited by [petitioner],
   as involving rules that "significantly undermined fundamental
26 elements of the defendant's defense." (*Scheffer, supra,* 523 U.S. at

1         p. 315.)  In contrast, polygraph evidence served only to bolster
defendant's credibility; defendant was not deprived of a defense in
2         contravention of the Sixth Amendment.

3 People v. Rodriguez, slip op. at 25.

4         A per se rule precluding admission of polygraph evidence does not violate the

5 federal constitution.  See U.S. v. Scheffer, 523 U.S. 303 (1998).  For this reason, the trial court's

6 reliance on California Evidence Code § 351.1 did not violate petitioner's federal constitutional

7 rights and the state court of appeals' rejection of this claim was neither contrary to, nor an

8 unreasonable application of, clearly established federal law.  Petitioner's fourth claim for relief

9 should be denied.

10         For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that

11 petitioner's application for a writ of habeas corpus be denied.

12         These findings and recommendations are submitted to the United States District

13 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

14 days after being served with these findings and recommendations, any party may file written

15 objections with the court and serve a copy on all parties.  Such a document should be captioned

16 "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that

17 failure to file objections within the specified time may waive the right to appeal the District

18 Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

19 DATED: June 3, 2008.

20

21                             UNITED STATES MAGISTRATE JUDGE

22

23 12
rodr0260.157
24

25

26

                           17